In the Matter of the Estate of EMILIE H. McNAMARA, Deceased.

Surrogate's Court, Kings County, October 22, 1930.

*Edward J. Flanagan,* referee.

*Goodstein, McNamara & Kavanagh [Joseph A. McNamara* of counsel], for the administrator.

*Gerald J. Carey,* for objectant Madeleine T. Carey.

*Rubenstein & Rosling,* for Alfred J. McNamara, objectant.

*Cullen & Dykman,* for Brooklyn Trust Company.

WINGATE, S. The questions here raised come before the court on a motion to confirm the report of a referee appointed to hear and report upon objections to the account of an administrator.

The painstaking and careful consideration discernible in the report and findings of the referee are such that, under ordinary circumstances, the court would feel under no compulsion to give the matter more than cursory attention. The violent attacks made by disappointed parties on certain of the results reached and even upon the impartiality of the referee himself are such, however, as to require a personal consideration by the court of the subject-matter of the more violently contested issues. This has involved the study of an extremely voluminous record and of the ten briefs filed.

Eliminating minor considerations, the salient facts may be stated as follows:

Emilie H. McNamara died on March 30, 1924. She was survived by her husband, a physician by profession, who is the accountant herein, two sons, George, born February 22, 1903, and Alfred, born October 29, 1904, and a daughter, Madeleine, born October 7, 1908. Diligent search was made for a will, but none was found, and on July 8, 1924, the widower received administration upon

the estate. Some ten months later, a will was found in the safe of a corporation controlled by decedent's half-brother, from whom inquiry on the subject had previously been made and who had denied any knowledge concerning it. This will bequeathed all of decedent's property to the children in equal shares, and named the Long Island Loan and Trust Company as executor. This concern was no longer in existence, having been absorbed by the Brooklyn Trust Company. The will was filed in this court with reasonable promptness, but its probate was considerably delayed owing to the fact that it had been executed on February 11, 1910, and all three of its subscribing witnesses were dead. For some time there appears to have been reasonable ground for apprehension lest its probate would prove impossible owing to this condition. The intention of the widower to divide the estate in accordance with the wishes evidenced by the will, even if its formal establishment should prove impossible, is clearly demonstrated by all of his acts subsequent to its discovery.

The estate consisted almost entirely of certain jewelry and personal property and of $50,000 of bonds of the Victor A. Harder Realty Construction Company. Disregarding for the moment the personal property and estimating the administration expenses at the ordinarily reasonable figure of four per cent, this would mean that each of the three children would be entitled to receive $16,000 from the estate.

In accordance with his apparent desire to make such equal and equitable division, Dr. McNamara caused the $50,000 of bonds to be redeemed, and received three checks, aggregating such sum, one payable to Madeleine McNamara, S. J. McNamara, administrator, in the sum of $17,000, one to George A. McNamara in the sum of $17,000, and one to Sylvester J. McNamara for $16,000. The check to the order of George A. McNamara was turned over to him by the administrator. He thereupon gave back his check for his *pro rata* share of the expenses of administration, executed a general release, and dropped out of the picture. He makes no objection or claim in this proceeding.

There remain for consideration, therefore, only the interests in the estate of the other son, Alfred James, and of the daughter, Madeleine, who at this time were respectively about twenty-two and eighteen years of age.

Alfred was at this time a novice in a religious order. He was permitted by the rules of the order to own property up to the time of assuming his final vows, which was to occur when he became twenty-five years of age, but was not permitted to use it. Under date of November 14, 1925, he assigned his interest in his mother's

estate to his father. This assignment was acknowledged before a notary and appears to have been entirely regular. Although not evidenced in any writing, the arrangement made between them appears clearly to have been that in view of Alfred's situation in connection with the religious order, this interest should be held by the doctor for Alfred until the latter had definitely decided whether he wished to become a permanent member of the order, on attaining twenty-five. If he did so decide, the property should become the doctor's property. If he decided to withdraw, the doctor should turn it back to him. It appears that the doctor invested a portion of Alfred's share in the stock of Tobacco Products Company, purchasing 500 shares of that stock for $10,400. Alfred later decided to withdraw from the order and his father thereupon turned over to him this stock, a check for $5,800 and $200 in cash, and Alfred executed and delivered a general release. If the investment in the stock is to be held to have been made for Alfred's account, it is apparent that he received from his father the equivalent of $16,400, or slightly more than the estimated distributable one-third received by his brother. At the time of such delivery, however, the stock had depreciated somewhat in market value, being then worth approximately $7,500. Alfred's objection to the present accounting is chiefly based upon such depreciation. To overcome the presumption of due and proper settlement raised by the execution of his release, he sought to show that it was executed under circumstances amounting to duress. Even if the mute evidence of the record would justify a holding that duress or fraud had been practiced, this court would have serious misgivings in reaching an affirmative finding to that effect after the carefully considered negative determination of the referee, since it is a fundamental principle of law that findings based on conflicting testimony are not lightly to be set aside by a court which has not seen and heard the witnesses themselves. (*Smith* v. *Lennon*, 131 N. Y. 560; *Burden* v. *Burden*, 159 id. 287; *Ostrander* v. *Fellows*, 39 id. 350; *Lyman* v. *Perlmutter*, 49 App. Div. 630; affd., 166 N. Y. 410.) But in this case the testimony on behalf of Alfred, as disclosed by the record, is of so evasive and unsatisfactory a nature that the court would feel inclined to set aside the report of the referee in this regard had he decided that this settlement did not constitute a full and complete accord and satisfaction between the parties. In the opinion of the court, the contents of the record conclusively demonstrate that this son was a wholly unreliable witness entitled to no credence whatsoever, and such was evidently his impression upon the referee. Even were this not so, the result, so far as concerns

the objection of Alfred to the account, must be the same. There is no pretense on his part that his assignment of his interest in the estate to his father was not a voluntary act. This being so, such interest became vested in the father as an individual, and any rights which the son had in the property which came to the father as a result of such assignment arose not by reason of any estate rights, but solely by reason of the agreement between them, with which the estate as such had absolutely nothing to do. The terms of that agreement were that the father should receive the property and hold it for the son and turn it over to the latter in the event that he did not decide, on reaching twenty-five years of age, to become a permanent member of the religious order. He received it. He held it. The method of holding it was not specified or proved. His method of so doing was apparently the same as that which he employed with his own funds. Was this method of holding improper? The record is silent on that point. Wherefore, in view of his subsequent delivery of it to the son in such state, and its acceptance by the latter, it is to be presumed that all obligations in this regard were fulfilled. In any event it forms no basis for objection against the estate administration. (*Matter of Wien,* 137 Misc. 456.)

This brings us to the most unpleasant phase of the rather sordid features of this case, which concern the rights in the estate of the daughter, Madeleine M. Carey. Her chief claim is in connection with the income on her share of her mother's estate, during her minority, amounting, it is alleged, to $4,852.53. In order fully to appreciate the situation here existing, it will be necessary, briefly, to glimpse the situation of the father and daughter up to the time the latter attained her majority.

As shown by the record, he was a physician, enjoying an average gross income of about $7,500 a year, and a net income after deducting the reasonable and necessary expenses of his business of less than $3,900. From this sum he was obliged to provide for all living and personal expenses of his family and himself, in so far as he did not encroach upon principal savings, which, in the usual case, he could not be held obliged to do. It was shown with reasonable clearness that during the four years' period here in question, Dr. McNamara expended on behalf of this daughter over $4,200 for tuition, etc., at expensive private schools, well over $2,000 for clothing, $2,900 for vacation trips to Europe and expensive American resorts, and $488.70 for dentist bills, in addition to giving her cash allowances totalling $2,140 and making heavy additional payments for her advancement, comfort and welfare. It is objected on her behalf that not all of these payments, aggregatating $13,000, have

been proved with complete legal conclusiveness. Even were this to be granted, there remains enough in the record to demonstrate that the payments made by the father to and for her during this period were not considerably less in amount than his total net income for such period. It is contended on behalf of this daughter that he must be held to have paid all these sums from his own resources to the complete exoneration of her income from her mother's estate. To support this position, cases are cited to the effect that a father is legally obligated to support his minor child. This legal principle is unquestionable, but falls far short of a demonstration that a father whose total net income is less than $4,000 a year is obligated to give that child spending money at the rate of over $500 a year, to maintain her at exclusive and expensive private schools, the attendant cost of which totals more than a quarter of his entire income for the period, to give her vacations in Europe and at expensive American resorts, and, in addition, to permit her, practically unrestrained, to expend such sums for clothing as her fancy may dictate.

To this court, the language of the Court of Appeals in *Matter of Davis* (184 N. Y. 299) possesses considerable pertinency. The question there concerned the propriety of the expenditure by a grandfather, standing in *loco parentis*, of a minor's income for the infant's advancement. The court says (at p. 303): " While it is true that, strictly speaking, as the father of the appellant, the testator would have been bound to support her [304] entirely at his own expense, it was natural that after the legacy had become payable to her the testator should think it wise to apply that income to give the appellant greater educational advantages than hitherto he had felt himself able to afford. A father might have done the same, even if we assume that without authority from some court it would have been unjustified."

The assumption contained in the last sentence of the foregoing opinion, the court is not inclined to indulge under the facts shown in the case at bar. On the financial facts of Dr. McNamara's situation, he would fully have complied with his paternal obligation had he sent his daughter to public schools, clothed her at moderate expense, cut down her personal allowance to a nominal sum, and permitted her to spend her vacations in the city. Unquestionably such a course would have been comparatively detrimental to her social standing and marital prospects. Under such circumstances the court would undoubtedly have authorized the employment of her income in this way, since it would have involved no encroachment upon the principal and would merely have applied its current use to her advancement at a time when such employment would

be most permanently conducive to her future welfare, as well as to her present happiness.

The opinion of the court, therefore, coincides with that of the referee in overruling the objection of this daughter to the employment by her father of this income for her benefit.

The further facts respecting this daughter's share of the principal are illiminating on the general subject of the father's *bona fides* in the entire matter. In 1928 Dr. McNamara paid her $1,000 in cash on account of her distributive share and had a $15,000 guaranteed first mortgage registered in her name and tendered it to her. This would have completed the payment to her of her $16,000 interest in the estate, but she refused it unless she also received certain silverware which is the subject of another objection to the account.

The facts respecting this silverware will be briefly examined. It consisted of usual flat tableware which had constituted the subject-matter of wedding gifts at the time of the marriage of decedent and the doctor some twenty-five years before, and had been in constant, daily use in the household during the entire continuance of their married life. It was marked with the maiden initials of the bride, was claimed by the doctor as his personal property, and was not included by him in the assets of his wife's estate. It does not appear from the record as to whether this gift was from friends of the bride or of the groom.

Counsel for the objectors contend that this property belonged to the estate of the wife, although they state themselves unable to cite any authority on the subject. A cursory examination by the court of the pertinent authorities has disclosed three decisions possessing more or less weight in the determination of the respective rights of the spouses in wedding gifts. The first is *Carroll* v. *Lee* (3 Gill & Johns. [Md.] 504), decided in 1832, which determines that they belong to the husband in the absence of a clear showing of intent by the donors to the contrary. While the court (at p. 508) notes that under the existing law of that State a wife may own separate property, the general reasoning of the opinion seems so permeated with the older conception of the wife's disability in this direction as to deprive the decision of any particular present-day authority. An exactly contrary result was reached by the Kansas City Court of Appeals in *Ilgenfritz* v. *Ilgenfritz* (49 Mo. App. 127), but the authority of this decision is impaired by reason of its apparent reliance upon the particular terms of the Missouri statute, therein applied, respecting the property of married women. The third determination of some interest in this connection is *Wainess* v. *Jenkins* (110 Misc. 21), which is a decision of the Third District

Municipal Court of Brooklyn. While the opinion contains a general dictum based upon the *Ilgenfritz* case, that wedding gifts are the property of the bride, the question before the court concerned merely the ownership of household property purchased by a woman with money given her personally by her mother and sister as a wedding gift. Such property was held to belong to her individually.

While the general subject is undoubtedly a most interesting one on which opinions may well differ, its determination is not required in the case at bar, in view of the provisions of section 200 of the Surrogate's Court Act, which, at the time of the death of this decedent, provided in subdivision 1 that " all housekeeping utensils * * * and household furniture," not exceeding $500 in value, should not be deemed assets of the estate of a person " leaving a widow or husband or minor child," and should be " set off to such widow, husband or minor child or children," it being further enacted that " such property so set apart shall be the property of the surviving husband or wife, or of the minor child or children if there be no surviving husband or wife."

This section is a re-enactment, without change, of section 2670 of the Code of Civil Procedure and has been the subject of repeated judicial construction. As a result of these determinations, it is clear that the property enumerated is the absolute property of the survivor, passing by operation of law (*Matter of Leonard*, 113 Misc. 205, 208; *Matter of Shulenburg*, 114 id. 155; *Crawford* v. *Nassoy*, 173 N. Y. 163, 166; *Matter of Barthel*, 111 Misc. 727; affd., 192 App. Div. 926; *Matter of Hulse*, 41 Misc. 307; *Foryciarz* v. *Prudential Insurance Co.*, 95 id. 306, 309; *Matter of Shonts*, 191 App. Div. 427, 432; reversed on other grounds, 229 N. Y. 374; *Matter of Hallenbeck*, 195 id. 143; *Matter of Osborn*, 220 id. 595); that it forms no part of the assets of the estate (*Matter of Mack*, 164 N. Y. Supp. 590, 591; *Sheldon* v. *Bliss*, 8 N. Y. 31, 34; *Matter of Baldwin*, 67 Misc. 353), and may properly be awarded to the surviving spouse on the final judicial settlement of the accounts of the personal representative of the deceased spouse. (*Matter of Warner*, 53 App. Div. 565; *Matter of Draper*, 109 Misc. 404, 405; *Matter of Shanley*, 95 id. 427, 431; *Matter of Belcher*, 129 id. 218, 221.)

For this reason, the court is of the opinion that the determination of the referee that the objection to the account on the ground that this tableware was not included therein, was not well founded on the facts appearing in this case. It is, of course, true that if the property claimed by the husband to be exempt exceeded $500 in value, he would be liable for any excess value over that sum, but there is no allegation or presumption on that score in this case. Since this property was not set forth in his account, a settlement

of such account would not make the matter *res adjudicata*. It would, therefore, be both the right and the duty of the executor to inquire into the question of value and to pursue the rights, if any, of the estate in this regard.

The opinion of the referee holds in effect that various items of jewelry and a diamond were a part of the decedent's estate and should be turned over by the administrator to the executor. While the court is not entirely clear that this is a correct determination respecting the pin received from Mrs. Moran, the administrator expressly acquiesces in the result and it will be affirmed. The question of the diamond, however, deserves passing notice. This was one of three stones in a ring given by Dr. McNamara to the decedent and was unquestionably a part of her estate. Wherefore the gift of one of these stones by the doctor to his second wife was an improper dealing on his part with the assets of the estate and must be rectified. It may be noted, however, that the doctor gave the other two stones from this same ring to his daughter, and it should be noted by the executor in connection with the future administration of the estate that such gift was equally unauthorized and that all three diamonds should properly be administered by it as assets of the estate.

In conclusion, the court can, in justice, not fail to note and express disapproval of the entirely unjustifiable personal attacks upon the administrator and referee made in the briefs of certain parties. The personal characteristics of the former are not in issue in this case. His actions in certain respects were injudicious and to that extent he is properly accountable. So far as concerns the balance of the record, his chief fault appears to have lain in the fact of his having been an over-indulgent father.

The attack on the referee is not to be lightly ignored. As is the case with all similar appointments by this court, his selection was the result of his integrity, learning and high standing in his profession. That he or any other man of his type would be influenced in the slightest by the fact that he was acquainted with one of the litigants, is absurd and unthinkable to a degree, and the record in this case is the best possible refutation of the improper insinuations here made.

It results from the foregoing that the report of the referee is in all respects confirmed.

Settle order, on notice, accordingly.